Seymour Wasserstrum, Esq.
Law Offices of Seymour Wasserstrum
205 W. Landis Ave.
Vineland, NJ 08360
(t)856-696-8300 | (f)856-696-3586
MyLawyer7@aol.com

## UNITED STATES BANKRUPTCY COURT
## DISTICT OF NEW JERSEY
## CAMDEN VICINAGE

| In re: | Case No.: 21-19913-ABA |
|---|---|
| Frank P. Martines, III | Hearing Date: May 24, 2022 |
| Debtor(s) | 10:00 AM |
| | Chapter: 13 |
| | Motion to Withdraw as Counsel |

## CERTIFICATION OF SEYMOUR WASSERSTRUM IN SUPPORT OF

## MOTION TO WITHDRAW

I, <u>Seymour Wasserstrum,</u> attorney for the Debtor is this case, have personal knowledge of the facts set forth herein, and I am authorized to make this certification in support of my motion to withdraw as counsel for the debtor, Frank Martines III.

1) On May 23, 2022, my office received three phone calls from Frank Martines. Each of those calls were documented by my receptionist, Melissa Ramirez, as part of our daily call log. Set forth below are the notes taken by Ms. Ramirez on our call log for March 23, 2022:

| | | | | |
|---|---|---|---|---|
| Frank Martines | 3/23/2022 | 267-504-0749 | 10:11 | Speak to SW about his home and would like the check to be sent to 1115 Durfor St Philadelphia PA 19148 |
| Frank Martines | 3/23/2022 | 267-504-0749 | 1:07 | Speak to SW regarding a check saying if a check is cashed and it was |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | not him, he will call the police department transferred to SW |
| Frank Martines | 3/23/2022 | 267-504-0749 | 4:28 | Would like to speak to SW, he will give the office a call later |

2) I took the first call from Mr. Martines at approximately 10:12 am, and what he said to me was very surprising and made no sense whatsoever. He spoke in a rather loud and threatening manner, and he said that I had better make sure that when the trustee sends him a check, that the check should be sent to him at 1115 Durfor Street in Philadelphia, and that it better not be sent to his mother's address.

3) I told him that I didn't believe that the trustee was going to send anyone any checks, but Mr. Martines insisted that a check was going to be sent out, and that check better be mailed to him.

4) Mr. Martines also told me that he had received a check from the trustee in his prior case, even though his mother, Maria Martines, had tried to keep him from getting it.

5) I attempted to change the subject matter of the conversation, and I told Mr. Martines that I had been preparing his mother to appear at the 341 meeting of creditors on the following day, and that I would probably need to be in touch with him in the future to get some documentation as to his expenses.

6) Mr. Martines again directed the conversation back to the check that he was supposed to be getting, and we then concluded our conversation.

7) Shortly after our conversation, I asked my assistant, Nigel Lunsford, to look into Mr. Martines' prior chapter 13 to determine if the trustee had ever sent out any checks in that case to Mr. Martines or his mother. After researching the issue, Mr. Lunsford told me that the trustee reports did not indicate any checks having been issued to either Mr. Martines or his mother.

8) I thereafter called Maria Martines to tell her about out my conversation with her son, Frank Martines. Our office had filed Mr. Martines' chapter 13 case based on a power of attorney that Mr. Martines had given to his mother, Maria Martines in 2013, and virtually all of our prior communications with respect to Mr. Martines' case had been conducted with Maria Martines.

9) Maria Martines was very surprised when I told her what Frank had said. She told me that she had no idea what Frank was talking about, and that she had never received any checks from Ms. Balboa. Maria then repeated to me some information about Frank that she had previously told me - that Frank has had a lot of drug problems, and that he gets methadone treatment every day.

10) At about 1:10 pm on March 23, I received a second phone call from Frank Martines, and as noted in the notes of my receptionist, he now brought up the issue about involving the police in the event that a check that was intended for him was cashed by someone else. I told him that I did not think that anyone would try to cash a check that was issued to him, and again told him that I might be needing to contact him directly in the future if I needed more information or documentation after the meeting with the trustee that his mother was going to attend with me on the next day.

11) Mr. Martines again called my office on March 23, at 4:28 pm, but I was not available to speak with him at that time.

12) On the following day, March 24, 2022, Mr. Martines called my office four times. Listed below are the notes of three calls listed on our call log that were taken by my receptionists, Melissa Ramirez, and Kelly Atwood (Kelly took the third call). The fourth call was made after normal office hours, and that call was answered directly by me.

| Name | Date | Phone | Time | Notes |
|---|---|---|---|---|
| Frank Martines | 3/24/2022 | 267-504-0749 | 9:13 | Would like to know the name of the trustee on his case Andrew B Altenburg JR, transferred to SW |
| Frank Martines | 3/24/2022 | 267-504-0749 | 1:27 | Speak to SW he believes he got a missed call, transferred to SW |
| Frank Martinez | 3/24/2022 | 267-504-0749 | 202 | SW Bankruptcy request today Got off the phone with the trustee's office spoke to a Kim. Transferred to SW |

13) On the first call at about 9:15 am, Mr. Martines again started talking about the check that he said he was supposed to get. He asked for the number of the trustee's office, and I gave him the number of Ms. Balboa's office. I also told him that I would be speaking with his mother pretty soon, in preparation for that morning's meeting with the trustee.

14) Shortly thereafter, Maria Martines called my office at 9:42 am. I told her about my conversation with Frank, and we prepared for her meeting with Ms. Balboa.

15) After the 341 hearing, Ms. Martines and I had a phone conversation concerning some of the issues raised at the meeting. After discussing those issues with her, I suggested that I thought it would be a good idea if we called Frank to let him know that the hearing went well, and that we would need some more information from him to successfully move forward with his case.

16) I therefore placed a call to Frank Martines with Maria Martines on the line. I told Frank that we had concluded the meeting with Ms. Balboa, that it was a rather long meeting taking about 35 minutes, that his mother had done well, and that we would be needing some information from him in the future.

16) Mr. Martines called me at 1:27 pm on March 24, 2022, and we had a very brief conversation.

17) Mr. Martines called me again at about 2:02 pm and told me that he had spoken with the trustee's office.

18) Then, around 5:30 pm on March 24, 2022, after my receptionist had left for the day, I picked up the ringing phone, and Mr. Martines spoke to me in a very curt and angry tone. He said that he had recorded every conversation that we had, and that I had lied to him. I told him I had no idea what he was talking about, and that I had never lied to him. He said that yes, I did, that I had told him that the trustee meeting had not taken place, but that it had actually taken place.

19) I told him that what he said was not true, that I had clearly told him that the trustee meeting had taken place earlier that morning, and that I had his mother as a witness because she was a part of the conversation, I had with him shortly after the trustee meeting.

20) Mr. Martines cut the conversation short by saying words to the following effect: "I'm reporting you to the bar association, have a good life." Then he hung up.

21) There is no question that I told Mr. Martines about the 341 meeting both prior to it occurring and after the meeting had taken place.

22) I immediately called Maria Martines to let her know about the conversation I had just had with Frank. She was totally surprised and could not believe what Frank had said to me.

23) Maria told me that of course I had told Frank about the 341 meeting, and that she was a part of that conversation. She even remembered that I had told Frank that the meeting had taken about 35 minutes and that the meeting had gone well.

24) I asked Ms. Martines to please make sure that she remembers our conversation in the future because I might need her to testify against her son in the event, he continued to lie about me. She said that she would certainly testify on my behalf if that were necessary.

25) My statements set forth above concerning my conversations with Frank Martines and Maria Martines are based upon my present recollection of those conversations. I did not take detailed written notes concerning those conversations as they were taking place.

26) I did, however, record my conversation with Maria Martines, as set forth in paragraphs 22 through 24 above. I advised her that I was recording that conversation, and she approved of my recording the conversation.

27) It appears from my conversations with Mr. Martines on March 23 and March 24, 2022, that Mr. Martines somehow believed that I knew something about a check that he was supposed to receive from the trustee's office, and that I somehow was working together with his mother to deprive him of his rights to that check. I have never really understood what he was talking about and why he thought he was entitled to a check from the trustee.

28) He also falsely told me that he had received a check from the trustee's office in his prior Chapter 13 case.

29) The April 13, 2022, certification of Kimberly Talley, a paralegal at Ms. Balboa's office, attached as Exhibit C to Ms. Balboa's motion to dismiss debtor's case states in Paragraph 10 that "Mr. Martines also stated that he called Seymour Wasserstrum, Esquire earlier in the day who told him that the 341 Meeting of Creditors was not conducted on March 24, 2022." This statement that Mr. Martines made to Ms. Talley is not true, and Mr. Martines' mother, Maria Martines, can most certainly corroborate that I was totally truthful with Mr. Martines about the meeting of creditors having taken place, and that she appeared and testified at that meeting.

30) Mr. Martines has made up a story about a check he supposedly received from the trustee's office in his prior case, he has also made up a story about a check he said he was supposed to receive in this case, and he has made a false statement to the trustee's office about a conversation he had with me concerning the happening of the trustee meeting on March 24, 2022. He has also told me he was going to report me to the bar association, and he made a similar statement to Ms. Talley. As set forth in paragraph 12 of Ms. Talley's April 13, 2022, certification, "Mr. Martines stated that Mr. Wasserstrum was not truthful with him and he would be contacting the New Jersey Bar Association."

31) I was not aware of Ms. Balboa's concerns about this matter until I received a call from Maria Martines on the morning of Friday April 15, 2022. Ms. Martines told me that she was concerned because she had just received a motion from Ms. Balboa seeking dismissal of Frank's case. She texted me portions of the motion, and this was the first time that I learned about the motion.

32) Shortly thereafter I reviewed the entire motion, and that was the first time that I saw Ms. Balboa's letter to Frank Martines dated March 29, 2022. A copy of that letter had been sent to me, but this was the first time that I saw that letter. I was in Chicago from March 29, 2022, until April 12, 2022, and no one had brought Ms. Balboa's letter to my attention.

33) After I reviewed Ms. Balboa's motion, I began working on a motion to withdraw as attorney for Frank Martines.

34) Around the time I was getting ready to finalize the motion, I received a call from Anthony Cassise, the husband of Maria Martinez, and the stepfather of Frank Martines.

35) Mr. Cassise told me that Frank Martines would like to speak with me, and he asked whether the three of us could have a conversation within the next few days. I told Mr. Cassise that I would agree to have such a conversation.

36) As a result, we had a three-way conversation on April 19, 2022, and with the permission of Mr. Martines and Mr. Cassise, I recorded the conversation. During that conversation, Mr. Martines made the following statements:

   a) On March 23 and March 24, 2022, he was going through a very difficult period. He said he had been suffering from a very bad infection of several teeth with an abscess wrapped around his nasal passage that had been causing him severe pain for about five weeks before he was finally able to resolve the problem by getting the proper medical treatment.

   b) He had been self-medicating to try to kill the pain, there was yellow and blood leaking out of his tooth number 14, the pain was shooting into his head and into his eyeball, and he had a

very high fever of 103.7 degrees. He said it was the worst thing he ever went through in his life, the pain was unbearable, and that is the reason he was so angry and so jumpy.

c)  He didn't have the money to pay for the treatment that he needed to relieve his severe pain, and after about five weeks of suffering, he finally got the medical treatment he needed when a family member had given him the money to pay for it.

d)  As a result of his severe pain, his self-medicating, including taking pain medicine and sleeping medicine, and his very high fever, he was not in his right mind, and when he spoke with me on March 23 and March 24 he was very angry at the world, and he was actually hallucinating.

e)  He admitted that I had in fact told him that the March 24, 2022, 341 trustee meeting had taken place and that his mother had testified at the meeting.

f)  On March 24, when he had previously stated to me that I had told him that the trustee meeting had not taken place, he had a 104-degree fever and was not in his right mind.

g)  He admitted that when he accused me of lying to him, and when he was claiming that he was supposed to get a check from the trustee, and when he said he would call the police if I didn't make sure that he got the money from the trustee, he was at almost a 104-degree fever and was not in his right mind.

h)  He said he never reported me to the bar association.

i) He is fine with the bankruptcy case, he wants the case to continue, and wants to do what is necessary to permit the case to continue.

j) He gives his mother full permission and power of attorney to do the bankruptcy. He wants to save his house so that his mother, his 16-year-old daughter, and Anthony Cassise can continue to live there. He wants to help Anthony and his mother and his daughter.

k) He apologized and said he was sorry.

37) The accusations that Mr. Martines made against me have caused me and members of my staff a great deal of stress and concern. To summarize, Mr. Martines has engaged in the following conduct which makes it extremely difficult for me to continue to represent him:

a) He called my office and demanded that he be sent an alleged check that the trustee was going to mail out.

b) He told me that he had received a check from the trustee in his prior case, and that statement was not true.

c) He indicated he was going to involve the police if he did not get the check from the trustee.

d) He falsely claimed that I had told him that the trustee meeting had not taken place.

e) He told the trustee's office that I told him the that the trustee meeting had not taken place.

f) He told me that he was going to report me to the bar association and to have a good life.

    g) He told the trustee office that he was going to report me to the bar association.

38) I accept Mr. Martines' statements and explanation that he gave to me during our three-way conversation on April 19, 2022, as being true, and I can understand the serious problems and challenges he was going through. He said he was sorry, and he apologized, and I forgive him.

39) Nevertheless, the conduct in which he has previously engaged has made it extremely difficult for me to continue to represent him. I believe that there has been a serious breach in the attorney-client relationship, and I don't believe that it would be appropriate and proper for me to continue to represent Mr. Martinez in light of the erroneous and inaccurate allegations that he made against me. Furthermore, his conduct has caused a great deal of stress and anxiety to various members of my staff who have worked on his case, and they no longer feel comfortable working on his matter.

40) On May 2, 2022, I emailed Ms. Balboa's office and advised her that I would be filing this motion. I asked if she would postpone her motion to dismiss so that Mr. Martines would have sufficient time to obtain other counsel and oppose her motion to dismiss. I received an email back from Jennifer DeSantis, Office Administrator at Ms. Balboa' stating: " Good morning, I spoke with Ms. Balboa, and we will not oppose a 30 day adjournment for both the motion and confirmation. Please submit adjournment requests for the motion and confirmation hearing. Thank you."

41) In light of the foregoing, I respectfully request that the Court enter an order permitting me to withdraw as attorney for Mr. Martines.

I, Seymour Wasserstrum, certify all statements made heretofore by me is true and correct to the best of my information, knowledge, and belief; and I am fully aware that if any statement is willfully false, I am subject to punishment for false swearing.

Dated: May 3, 2022 */s/ Seymour Wasserstrum*
Seymour Wasserstrum, Esquire
Attorney for the Debtor